U.S. DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. _____

DAVID B. MURSTEN,

       Plaintiff,

vs.

NICK A. CAPORELLA,

       Defendant.

## COMPLAINT

Plaintiff DAVID B. MURSTEN brings this action against Defendant NICK A. CAPORELLA and alleges as follows:

### INTRODUCTION

1. Plaintiff David Mursten has worked as a consultant and advisor off-and-on for over 30 years to Defendant Nick Caporella, the founder, Chief Executive Officer, Chairman and majority owner of National Beverage Corp. ("National Beverage"), a public company in the business of manufacturing and distributing soft drinks and beverages. During the Labor Day weekend of September 4 - September 6, 2010, Caporella made an agreement for Mursten's ongoing services in Caporella's efforts to sell National Beverage to a foreign company.

2.     As will be set forth in detail below, Mursten fulfilled and fully performed his obligations under that agreement.  Caporella, however, abruptly banished Mursten from National Beverage when Mursten raised concerns about certain conduct admitted to by Caporella.  Caporella subsequently breached the agreement by failing to pay Mursten.  Mursten is now entitled to damages for Caporella's breach of the agreement.

## PARTIES

3.     Plaintiff David Mursten is a resident of the State of Georgia.  Mursten is a Florida attorney with a master's degree from Harvard University and a background and expertise in strategic planning for businesses and in political and governmental affairs.

4.     Defendant Nick Caporella is a resident of Broward County, Florida.  Caporella is the Chairman, Chief Executive Officer and founder of National Beverage.  Public documents indicate he owns 34,244,585 shares of National Beverage, representing approximately 74% ownership of the company.

## JURISDICTION

5.     This Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1), because it is a civil action between citizens of different States (Georgia vs. Florida), and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

## GENERAL ALLEGATIONS

A. **National Beverage, Caporella and Mursten.**

6. National Beverage is a public company incorporated in Delaware and listed on the NASDAQ stock exchange. It is headquartered in Fort Lauderdale, Florida. National Beverage considers itself a leader in the development and sale of flavored beverage products in the United States, offering a wide selection of flavored soft drinks, juices, sparkling waters and energy drinks, including such brands as Shasta, Faygo and LaCroix.

7. Corporate Management Advisors, Inc. ("CMA") is a separate management company set up and owned by Caporella that operates out of National Beverage's offices and provides management services to National Beverage. Pursuant to a management agreement, National Beverage pays millions of dollars in management fees to CMA each year.

8. Caporella has complete control over National Beverage and has an unorthodox management style. Caporella pilots a private jet (at age 76), eschews formal corporate speak for motivational and often unusual, weird or entertaining press releases, avoids holding meetings in National Beverage's offices, and commonly wears gym shorts, a t-shirt and sneakers to business meetings.

9. Over the past 30 years, Caporella and Mursten have shared a close personal and professional relationship. Mursten has performed work for Caporella on everything

3

from resisting a hostile takeover attempt of a public company where Caporella was the CEO to helping Caporella buy a new Mercedes.

10. Between 2006 and 2008, Mursten, among other things, was an employee of CMA and served as an assistant for legal matters in the Office of the Chairman of National Beverage, and as Assistant Corporate Counsel for CMA. Mursten's work during this period included, among many other things, advising Caporella on potential business acquisitions and opportunities.

11. In August 2008, Mursten was unable to obtain a commitment to a compensation plan from Caporella and stopped working for CMA on a day-to-day basis. At the time, Caporella's son Joseph, the President of National Beverage, sent an e-mail to Mursten stating "Nick [Caporella] has told me repeatedly that he has a new deal for you and has also put some wealth aside for you."

12. During the first half of 2010, while assisting Caporella on various matters, Mursten had discussions with Caporella about purchasing National Beverage's products as a distributor. Mursten had a self-financed concept to sell National Beverage's energy drinks in cities where the company had little or no distribution.

13. During the process of establishing this new business relationship, however, Caporella received an offer for the purchase of National Beverage. Caporella said he wanted Mursten to work on selling National Beverage rather than having Mursten establish an independent distribution company.

14. Specifically, in August 2010, a foreign company ("Company A") had sent Caporella a letter proposing specific terms for the purchase of National Beverage, including a purchase price per share.

15. Based on the number of shares he owned, this was an offer worth hundreds of millions of dollars to Caporella personally.

### B.    The Agreement.

16. Caporella and Mursten worked intensely over the Labor Day weekend of September 4-6, 2010 to strategize regarding the offer from Company A and to formulate a response to Company A's expression of interest.

17. During the course of that weekend, Caporella reached an agreement with Mursten to enlist Mursten's services fulltime going forward.

18. Caporella referred to his agreement with Mursten as a "Dr Pepper deal," because the vintage Dr Pepper bottle logo had the numbers 10, 2 and 4 on it,[1] and Caporella promised to compensate Mursten based on the same numbers. Specifically, Caporella agreed as follows (the "Agreement"):

    a.   when National Beverage was sold, Caporella would pay Mursten $10 million dollars or 2% of the total gross amount Caporella personally received, whichever was less; and

---

[1] The 10, 2, and 4 originated with a marketing promotion that "Dr Pepper Time" was at 10, 2 and 4 o'clock during the day.

b.      if National Beverage was not sold, Caporella would transfer to Mursten shares of National Beverage with a market value of $4 million dollars within one year, with the exact number of shares determined by Caporella choosing from the closing price for National Beverage's shares between that weekend (September 6) and the end of the year (December 31, 2010); Caporella would also pay to Mursten an amount of cash equal to Mursten's tax liability for the market value of the stock, and the taxes on the cash, in order to pay taxes.

19.     Caporella explained the "4" of the Agreement was stock plus cash rather than just stock because he did not want Mursten to sell stock to pay taxes, and because Caporella could get a tax deduction for the transfer of the shares and cash.

20.     Mursten suggested putting the agreement in writing at the time. Caporella responded that, if Mursten did not trust him to keep his promises, Mursten should stop working right now. Caporella reminded Mursten of the handshake deal Caporella had made for the leasing of National Beverage's headquarters office in Fort Lauderdale.

21.     Notably, National Beverage's publicly-filed Proxy Statements have repeatedly stated that the Company (*i.e.* Caporella) relies on trust and loyalty for compensation arrangements as opposed to written agreements:

> The Company may also, from time to time, pay severance to an employee, including an Executive Officer, based on, among other things, years of service, functional role or position and level of the individual's responsibility and reasons for terminating his or her services. **The Company believes in trust, loyalty and commitment from both the Company and the Executive Officers and that employment**

> **agreements are not necessary to achieve its goals** and meet the needs of the Executive Officers. The Company believes that the fact that most of the executives of the Company have been with the Company for a long period of time supports this belief.

Similarly, the company's Proxy Statements repeatedly state that Caporella has no predefined written plan for the annual cash bonuses paid to executives.

22. It was Caporella's strongly voiced intention at the time the Agreement was made to sell National Beverage by December 31, 2010 – that is, within the next four months. This was in order to avoid the federal income tax increase that Caporella expected when the so-called "Bush tax cuts" would expire on December 31, 2010. The potential changes in the capital gains tax rate would have drastically increased Caporella's tax bill on the sale.

23. Caporella urged Mursten to do everything possible to help get the deal closed by the end of the year, before the tax rates escalated.

24. As part of the Agreement, until the sale of National Beverage happened, Mursten would work for "free" – that is, Mursten would be paid nothing except for reimbursement of expenses in Caporella's discretion.

    D.    **The Efforts to Sell National Beverage.**

25. In response to Company A's expression of interest, after a weekend of intense strategizing and work, on September 6, 2010, Mursten had a courier collect for hand delivery to Company A overseas a letter that he and Caporella had prepared.

26. The next day, September 7, 2010, Caporella sent an email to his top management at National Beverage, commending Mursten and another individual for

their work during the Labor Day weekend. Caporella urged his management team to "reach out" to Mursten (and the other individual) and "offer your thanks! These two did . . . a miraculous job of creating that . . . 'one-of-kind' achievement! We are all indebted to them . . . ."

27. In response to Caporella's email, Mursten sent Caporella an email on September 7, in which he concluded by saying "THANK YOU doesn't begin to cover it!" Caporella acknowledged Mursten's e-mail later that night, saying "your letter was absolutely fantastic!!!"

28. Several days later, Caporella sent Mursten an e-mail saying "this project is the second most critical thing we have ever worked on" (the first being a reference to Mursten's work in the early 1980s to help repel a hostile takeover bid by Victor Posner, the corporate raider, of a public company where Caporella had worked as CEO).

29. Pursuant to the Agreement with Caporella, Mursten performed a variety of services to assist Caporella in the sale of National Beverage. These services included but were not limited to:

    (a) working to get a competitor of Company A to bid against Company A to buy National Beverage and Caporella's shares;

    (b) taking other strategic steps to increase the price Company A or another bidder would offer Caporella for National Beverage;

    (c) identifying an investment banking firm and law firm to advise National Beverage and Caporella in the negotiations with Company A;

      (d) participating in due diligence planning meetings and other strategy meetings with National Beverage's top executives;

      (e) preparing a critical presentation for Caporella to use in meeting with senior executives from an advisory firm representing Company A;

      (f) traveling to New York City for Caporella's meetings with lawyers and bankers;

      (g) providing analysis on various strategic and tactical issues during the negotiations with Company A; and

      (h) working on implementing a process Caporella was considering for making the sale of the company contingent upon approval by a majority of the shareholders, excluding Caporella's shares – that is, a "majority of the minority" vote.

30.    Mursten's myriad services ultimately helped get Company A to increase its per share offer by the spring of 2011.  The increase meant additional tens of millions of dollars for Caporella personally.

31.    As expected and required by Caporella, Mursten remained available to assist at any time, 24 hours a day/ 7 days a week, including holidays.  Mursten sacrificed his personal and family life to remain available to Caporella, wherever and whenever needed or asked.

32.    In short, Mursten did everything within his power and means to assist Caporella in making a deal to sell National Beverage and fully performed on his end of the bargain under the Agreement.

33. In December 2010, Congress and President Obama agreed to an extension of the so-called "Bush tax cuts." This removed December 31, 2010 as a deadline for Caporella to sell National Beverage to Company A or potentially pay millions of dollars more in federal income tax.

34. Caporella told Mursten the deal with Company A would still conclude in the next six months, most likely by the end of April 2011 (the end of National Beverage's fiscal year). Caporella and Mursten renewed their Agreement based on this schedule.

35. While Mursten was working on the sale of National Beverage, Caporella wanted Mursten to assist with other matters of varying importance to him beyond the scope of the Agreement. Mursten performed additional services, including but not limited to:

   (a) assisting in handling SEC disclosure issues;

   (b) serving as one of two trustees of the "Founders Trust," a grantor trust created by National Beverage to reward a specified group of potential beneficiaries with National Beverage stock and cash;

   (c) reviewing an agreement between Caporella and his brother for Caporella's deeply discounted purchase of his brother's shares of National Beverage;

   (d) assisting Caporella in the potential purchase of various real estate properties in Florida, Mexico, New Hampshire and New York (including a luxury beachfront hotel);

   (e) handling sensitive personal and family matters for Caporella;

   (f) assisting in Caporella's consideration of an investment opportunity in a medical startup;

   (g) purchasing a new Mercedes for Caporella;

   (h) recruiting a wealth manager for Caporella; and

   (i) assisting the head of Caporella's aviation department, Caporella's son Vincent Caporella, plan for FAA-required maintenance on a Falcon 2000-EX jet exclusively piloted by Caporella and owned 80% by a National Beverage subsidiary and 20% by a Caporella-owned entity.

  36. In personally and directly handling the negotiations with Company A and its representatives, Caporella insisted his management company, CMA, continue to manage National Beverage for more than one year after Company A purchased the company. During this time, Caporella would continue to collect millions of dollars from National Beverage and would control the reporting of National Beverage's financial information to Company A.  Company A agreed to this term.

  37. In personally and directly handling the negotiations with Company A and its representatives, Caporella insisted that his son, Joseph Caporella, remain as President of National Beverage and continue to manage the company for more than one year after the acquisition.  During this time, Caporella's son would control the reporting of National Beverage's financial information to Company A.  Company A agreed to this term.

  38. April 2011 passed without Caporella making a deal with Company A.

  39. Company A's cash offer ultimately reached a higher per share figure by the spring of 2011, with the concessions to Caporella on CMA and the position for Caporella's

son.  Caporella was agreeable to the price with his "majority-of-the-minority" requirement for approval of the sale.  That requirement was unacceptable to Company A however.

### E.     The Renewed Agreement.

40.    On Sunday, June 12, 2011, Caporella and Mursten met at a restaurant in Sunrise, Florida and discussed the lack of a deal with Company A.  During this meeting, Caporella expressed his great appreciation for all Mursten was doing to contribute to making the deal with Company A happen and shared his awkward feelings about Mursten working for "free" for a longer period of time than Caporella had expected.  Caporella assured Mursten that he was "vested and invested," and that Mursten had earned the "4" in the "Dr Pepper deal."  The only issue was when Mursten would be paid, and Caporella said he would pick a specific date for the payment.  Caporella also said he still hoped to complete the "Dr Pepper deal" with the "10" – that is, by completing the sale to Company A.

41.    On October 24, 2011, Caporella renewed and reconfirmed the Agreement with Mursten and formally set the date for the payment of the $4 million worth of shares (and necessary cash for associated tax obligations).  Caporella telephoned Mursten and told Mursten that "October 24, 2011 is the start date."  Caporella said he had picked the date because it was 10, 2, and 4:  10/24.  Mursten thanked Caporella and complimented him for his great creativity.

42.    Later on the same day, Caporella sent Mursten a text message:  "Start date today, October 24 . . . Keep this David."

43.     Pursuant to the Agreement, this meant Caporella was obligated to pay Mursten "4" (*i.e.*, $4 million worth of shares plus cash for taxes) by October 23, 2012 (if the sale to Company A did not take place).

44.     A little over a week later, on November 3, 2011 Caporella's CMA gave Mursten an unsolicited check for $40,000 (1% of $4 million).

45.     Shortly after that, Caporella suggested that to celebrate Mursten's birthday (November 16), which was less than two weeks away, they take a trip to one of Caporella's favorite places, Cabo San Lucas, Mexico, where they could also look at a villa that Caporella wanted to buy.

**F.     The Events Leading Up to Mursten's Exile.**

46.     Caporella and Mursten flew to Mexico on Sunday, November 13, 2011, in Caporella's jet with other National Beverage personnel.

47.     Caporella pilots a Falcon 2000-EX jet that is co-owned by National Beverage and Caporella. In June 2011, Caporella had enlisted Mursten to assist the head of Caporella's aviation department (Caporella's son Vincent) to plan for FAA-required maintenance on the jet.

48.     The deadline for the maintenance was on or about September 9, 2011. After the deadline, without the maintenance, federal rules would require Caporella's jet to be grounded. The jet's schedule for maintenance troubled Caporella. The maintenance required several weeks, and Caporella did not want to be unable to fly, as pilot, for several weeks.

13

49. After an intense period of exploring many options for maintenance, and a fruitless search for a substitute jet that the septuagenarian Caporella could fly during the weeks of maintenance, the deadline passed without anything appearing to happen. Mursten did not learn how the required maintenance was addressed until the trip to Mexico.

50. The day after arriving in Mexico, on Monday, November 14, 2011, Caporella and Mursten were talking in Caporella's rented luxury villa overlooking the Sea of Cortez.

51. During the conversation, Mursten happened to ask Caporella about the maintenance on Caporella's jet. Caporella said ███████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████

52. Caporella's revelation stunned and concerned Mursten. But this was not the only stunning confession made by Caporella.

53. During the conversation, Mursten asked Caporella the secret of Caporella's success and great record of performance with earnings and tremendous dividends. Caporella said ███████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████

54. Connecting the dots, Mursten believed the reasons why Caporella wanted to minimize Company A's due diligence and why he demanded, in negotiations, that his company's management of National Beverage and his son (National Beverage President Joseph Caporella) remain in place after Company A's purchase – all to control the financial information which could reach Company A.

55. Notably, National Beverage announced in a recent press release (September 6, 2012) that it was reporting 20 consecutive quarters of revenue and net income growth. As the press release put it: "Wars, droughts, imploding governments, runaway commodities, *You Name It* crisis — and we scramble, juggle, switch gears — yes, we do it all and successfully advance revenues and profits."

56. During the course of this conversation, Caporella also revealed ███████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████
████████████████████████████████████████████

57. Mursten was greatly disturbed by these revelations. Caporella had admitted to conduct that could interfere with the sale of the company, defraud Company A, or defraud past and present shareholders.

58. On Wednesday, November 16, Caporella hosted a birthday dinner for Mursten at the luxury villa Caporella had rented in the Cabo San Lucas resort.

59. Two nights later, Mursten received a call in his hotel room from Caporella. Mursten advised Caporella that he would not be continuing on the trip to Houston, Caporella's next planned stop. Mursten said he wanted to be back in the National Beverage office on Monday morning in order to work with certain of National Beverage's executives and counsel to review some of the things Caporella had said earlier in the week.

60. Caporella asked Mursten what he meant. Mursten told Caporella he was referring to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and the other issues disclosed by Caporella. Mursten also said he would feel uncomfortable flying on the Falcon 2000-EX airplane.

61. Caporella was agitated and angry and ended the telephone call.

62. On Saturday, November 19, 2011, while Mursten was at the Los Cabos Airport waiting for his commercial flight, he received a text message from Caporella, which Caporella also sent to his son, Joseph Caporella (President of National Beverage) and Linda Crawford (senior office manager at National Beverage). Caporella's text read as follows:

> David,
> do not go to NBC [National Beverage] office until we speak. Also, i'm very sorry about your Emgy, If ynu make it home safely pls let Linda [Crawford] know. Based on you not trusting me or my word . . . I want you to be free of me and all my interests forever.
> Linda, David is no longer allowed in Office.  See me.

63.     After arriving in Florida, Mursten contacted Crawford, as instructed by Caporella.  Three days later, Crawford called Mursten and arranged to meet with him at a Starbuck's.  Crawford brought Brent Bott (a Senior Director at National Beverage) to the meeting.  Crawford started the meeting by telling Mursten: "We need to protect Nick from you, and need to protect the Company from you."  Bott said he was speaking for Caporella and told Mursten: "This is not because you left, it is because of what you said on the telephone Friday night."

64.     Crawford did not ask Mursten to complete any release, termination agreement or other documents.  Crawford did not ask Mursten for his keys to National Beverage's offices.  Crawford did not ask Mursten to return any company property, and did not bring Mursten's personal property from National Beverage's offices (or make arrangements with Mursten to retrieve it).  Crawford and Bott simply reviewed a series of matters on which Mursten had been working to learn their current status.

65.     Since then and continuing through October 23, 2012, Mursten remained available to fulfill any lawful assignment or provide any lawful advice requested of him by Caporella in connection with the potential sale of National Beverage or other matters and continued through the present without interruption to provide incidental services to Caporella.

## CAUSES OF ACTION

### COUNT I – BREACH OF CONTRACT

66. The allegations of paragraphs 1 - 65 above are reincorporated in this Count.

67. Caporella and Mursten entered into a valid and binding contract on or about September 4-6, 2010. That contract was renewed on one or more subsequent occasions, including most recently on October 24, 2011.

68. Mursten fully performed all services required of him under the Agreement through the first date set by Caporella, and then, as extended by mutual agreement, through the second date set by the Caporella.

69. Caporella has breached the Agreement by failing, on or before October 23, 2012, to transfer to Mursten the equivalent of $4 million worth of National Beverage shares (and cash to cover tax obligations), since National Beverage, as of this date, has not been sold.

70. As a direct result of Caporella's breach of the Agreement, Mursten has been damaged.

WHEREFORE, Plaintiff David Mursten demands judgment against Defendant Nick Caporella for compensatory damages, together with interest, costs, and all other and further relief as the Court deems appropriate.

## JURY TRIAL DEMAND

Plaintiff David B. Mursten hereby demands trial by jury on all claims and all matters so triable as a matter of right.

                        COLSON HICKS EIDSON, P.A.
                        255 Alhambra Circle, Penthouse
                        Coral Gables, Florida 33134
                        Tel: (305) 476-7400
                        Fax: (305) 476-7444

By:   s/ Curtis B. Miner
       Curtis B. Miner
       Florida Bar No. 885681
       E-mail: curt@colson.com